IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| JAMES E. STRONG, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 4:22-cv-00136-O-BP |
| § | |
| UNITED PETROLEUM § | |
| TRANSPORTS, INC., § | |
| § | |
| Defendant. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court are the Motion for Summary Judgment and brief, appendix, and supplemental appendix in support (ECF Nos. 153-55, 160) filed by Defendant United Petroleum Transports, Inc. ("UPT"); Response and brief and appendix in support (ECF Nos. 157-59) filed by Plaintiff James E. Strong ("Strong"); UPT's Reply and appendix in support (ECF Nos. 161-62); and UPT's objection to Strong's appendix (ECF No. 163). Strong did not respond to UPT's objection. This case was automatically referred to the undersigned pursuant to Special Order 3. ECF No. 4. Having considered the pleadings, summary judgment evidence, and legal authorities, the undersigned **RECOMMENDS** that United States District Judge Reed O'Connor **GRANT** UPT's Motion (ECF No. 153) and **DISMISS** Strong's claims.

**I.   BACKGROUND**

This is an employment discrimination case. Strong started working for UPT as a truck driver around September 2013. ECF No. 155 at 133, 209. He delivered fuel to UPT's gas station customers. ECF No. 155 at 241, 244. On February 9, 2018, Strong filed a charge with the Texas Workforce Commission ("TWC") and Equal Employment Opportunity Commission ("EEOC"), complaining of race discrimination and retaliation. *Id.* at 92-93. Nearly six months later, UPT

terminated his employment. ECF No. 155 at 133, 209. Strong asserts that UPT fired him for making safety writeups, filing the discrimination charge, and because of his race. *Id.* at 259. UPT maintains that it fired Strong for committing numerous violations of its safety policies. *Id.* at 209.

UPT's Safety Manual provides that "[p]reventable incidents that violate Safety Manual policies are subject to disciplinary actions, up to and including termination." ECF No. 155 at 31. The type of punishment varies based on how many preventable incidents occur within a two-year period. *Id.* at 32. If a driver has four preventable incidents within a two-year period, UPT typically terminates his employment. *Id*. at 32, 208. In the two years leading up to Strong's termination, he had three prior preventable incidents, and was on a "Final Written Warning." ECF No. 155 at 209, 33-37, 199. The Final Written Warning cautioned him that "[a]ny future infraction will lead to additional disciplinary action, including possible termination of your employment." *Id.* at 37. On July 27, 2018, Strong incurred his fourth preventable incident in the previous two years. *Id.* at 209.

UPT requires its drivers to follow a "10 Step Drop Process" for all "gravity drops." *Id.* at 29-30. A gravity drop is a method of unloading fuel from a truck trailer. *Id.* Under step eight of the drop process, drivers must perform a "bucket test" on "all trailer compartments." *Id.* at 21, 208. This involves "placing a bucket under the release valve and opening it" to check for any retained fuel. *Id.* at 30, 208. "The bucket test is the most accurate way to determine if there is any fuel remaining in the compartment and is the way in which all UPT drivers are trained." *Id.* at 208. "[R]etention of nearly any amount could" cause a subsequent driver to "scully out," or overfill the tank the next time the driver tried to load it with fuel. ECF No. 155 at 209, 247. Scullying out can be a serious safety issue, so it causes a temporary shutdown of the loading rack for all other trucks. *Id.* at 175, 209, 247. Thus, when a trailer has retained fuel on it, UPT protocol requires the driver

2

to notify the dispatcher on duty, document it on his freight bill, and get a yellow "Product Retained" tag to place on the trailer. *Id.* at 208-209, 247-48.

On July 27, 2018, Strong made a delivery to a QuikTrip ("QT") gas station. ECF No. 155 at 250. His company-issued iPad alerted him that he had 798 gallons of fuel left in his tank. *Id.* at 250. Strong tapped on the trailer, checked the sight glass, and concluded that his tank was empty and that his iPad was simply having connectivity issues that caused a false alert. *Id.* Strong then went inside the store and contacted the QT help desk, which informed him that based on its calculations, there was roughly a 150-gallon variance from the fuel loaded at the rack and what he actually delivered. *Id.* at 250, 73-74. Later that afternoon, QT informed UPT that it received 798 fewer gallons of fuel than it was supposed to and invoiced UPT for the discrepancy. ECF No. 155 at 57, 207.

Strong never performed the bucket test at the QT station, nor report the possibility that his trailer retained fuel. *Id.* at 45, 208-209. Instead, he returned to the yard and conducted a post-trip inspection, which included the same tap test and sight glass he performed earlier. *Id.* at 251. A few hours later, a different driver took Strong's truck/trailer and scullied out because of the fuel retained from Strong's delivery. *Id.* at 208, 77-81. Consequently, that driver was banned from the loading rack for a week. *Id.* On or about August 1, 2018, UPT terminated Strong's employment, with the stated reason that he failed to disclose the retention. *Id.* at 209.

Strong initiated this *pro se* proceeding against UPT on February 22, 2022. ECF No. 1. He has since amended his complaint three times (ECF Nos. 9, 15, 30). Liberally construed, the latest amended complaint (ECF No. 30) alleges race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and Chapter 21 of the Texas Labor Code; race discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981"); and retaliation under to the Whistleblower

3

Act. *Id.* at 9-13. On January 17, 2023, Judge O'Connor dismissed all of Strong's claims except for his claims arising under Section 1981. ECF No. 73. UPT now moves for summary judgment on all remaining claims. ECF No. 153.

## II.  EVIDENTIARY OBJECTIONS

As a preliminary matter, the parties object to several of each other's exhibits. ECF Nos. 157 at 3-5; 163. Summary judgment evidence "need not be authenticated or otherwise presented in an admissible form[,]" if it can be made admissible for trial. *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) (citing Fed. R. Civ. P. 56(c)(2)). Courts view summary judgment evidence in the "light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993). Additionally, the Court subjects the pleadings of *pro se* parties to less rigid analysis than those of a party represented by counsel. Courts must hold "a *pro se* complaint, 'however inartfully pleaded,' . . . to 'less stringent standards than formal pleadings drafted by lawyers.'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

First, Strong argues that the Court should disregard UPT's "Declaration of Carlton Bailey" (ECF No. 155 at 207-210) because it is unsigned and unexecuted. ECF No. 157 at 4. UPT has since filed a supplement to the appendix which includes a substantively identical declaration, signed and executed on January 3, 2024. ECF No. 160. Strong also argues that the declaration is "full of hearsay and opinions by a person that is not an expert." ECF No. 157 at 5. Specifically, he argues that Bailey's discussion of the Dallas area truck driver market is improper expert testimony. *Id.* at 3. The undersigned finds that it is admissible opinion evidence, and Strong does not identify the portions of Bailey's declaration that contain hearsay. The Court **OVERRULES** Strong's objections to the Declaration of Carlton Bailey.

4

Next, Strong objects to the "Declaration of Joanne Miley" (ECF No. 155 at 213), which verifies UPT's electronic files showing Strong's receipt of various UPT safety manuals. ECF No. 157 at 5. But the parties do not dispute that Strong received those safety manuals, and the undersigned does not rely on this exhibit in entering findings, conclusions, and recommendation. The Court **OVERRULES** Strong's objection to the Declaration of Carlton Bailey as **MOOT**.

UPT first argues that the Court should not consider Strong's exhibit entitled "QuickTrip EPA Delivery Entry Report" (ECF No. 159 at 8-9), because it (1) is not authenticated and (2) contains hearsay. ECF No. 163 at 2-3. Liberally construing Strong's pleadings and viewing the evidence in the light most favorable to him, the undersigned finds that the evidence is capable of authentication and likely satisfies the records of a regularly conducted activity exception to the rule against hearsay. Fed. R. Evid. 803(6). The Court **OVERRULES** UPT's objections.

UPT next disputes the admission of (1) an unsworn letter from Lisa Yvette Reese ("Reese") (ECF No. 159 at 25) and (2) her unsigned and undated affidavit (*Id.* at 26). ECF No. 163 at 4-5. UPT itself recognizes that Strong can easily "obtain[] properly sworn statements from" Reese. ECF No. 163 at 4. The undersigned thus finds that Strong can present these exhibits in an admissible form. *See Patel v. Texas Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019) (finding that district court erred where it declined to consider expert reports "solely because they were unsworn, without considering whether those opinions were" capable of admissibility). Accordingly, the Court **OVERRULES** these objections.

Third, UPT asserts that the Court should not allow Strong to rely on any statements or testimony from Dustin York (ECF No. 159 at 28-29). ECF No. 163 at 4-7. The Court previously ordered Mr. York to be deposed "on November [1, 2023], at 2:00 p.m." ECF No. 145 at 2. It cautioned Strong that "[i]f, for any reason, . . . Mr. York [was] not deposed by the discovery

deadlines set" by the Court, it would prohibit Strong from presenting Mr. York's testimony. *Id.* at 2-3. Mr. York was not deposed by the deadlines set in the Court's Order (ECF No. 145). Therefore, the Court **SUSTAINS** UPT's objection to the exhibits entitled "Sworn Statement of Dustin York" (ECF No. 159 at 28) and "Affidavit" (*id.* at 29).

Finally, UPT objects to Strong's use of an excerpt of an email communication from UPT's counsel titled "Confidential Settlement Discussion" (ECF No. 159 at 31), in which UPT offered to provide Strong with a neutral job reference in exchange for settling the case. ECF No. 163 at 7-8. Compromise offers and statements made during settlement negotiations are inadmissible "either to prove or disprove the validity or amount of a disputed claim[.]" Fed. R. Evid. 408(a). Strong relies on this exhibit to show that UPT "violated the LABOR LAW ACT [sic] by negatively responding or speaking negative when contacted from employers trying to hire the plaintiff." ECF No. 159 at 3. The only claims at issue are Strong's claims of discrimination and retaliation under Section 1981 in terminating his employment. *See supra* p. 4. Nothing about UPT's settlement offer is relevant to those claims, and the Court therefore **SUSTAINS** UPT's objection.

### III. LEGAL STANDARDS

#### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper when the pleadings and evidence illustrate that no genuine issue exists as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Slaughter v. S. Talc Co.*, 949 F.2d 167, 170 (5th Cir. 1991). Disputes concerning material facts are "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the

suit under the governing law. *Anderson*, 477 U.S. at 248; *Burgos v. Sw. Bell Telephone Co.*, 20 F.3d 633, 635 (5th Cir. 1994). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).

When a movant carries its initial burden, the burden then shifts to the nonmovant to show that the entry of summary judgment is inappropriate. *Celotex*, 477 U.S. at 322-24; *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992). Although the nonmovant may satisfy this burden by tendering depositions, affidavits, and other competent evidence, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden[.]" *Douglass*, 79 F.3d at 1429. Further, merely colorable evidence, evidence not significantly probative, or only a scintilla of evidence will not defeat a motion for summary judgment. *Anderson*, 477 U.S. at 249-250, 252; *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994).

Courts view summary judgment evidence in the "light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587; *Rosado*, 5 F.3d at 123. And factual controversies are resolved in favor of the nonmovant, but only when "both parties have submitted evidence of contradictory facts," thus creating an actual controversy. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). In the absence of any proof, however, the Court does not assume that the nonmovant could or would prove the necessary facts. *Id.*

In making its determination on the motion, the Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c). But "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[S]ummary judgment is appropriate when 'the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Edwards v. Oliver*, 31 F.4th 925, 929 (5th Cir. 2022) (quoting *Celotex*, 477 U.S. at 323).

    **B.    Section 1981 Standard**

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts[.]" § 1981(a). The statute defines "[m]ake and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b); *Arguello v. Conoco, Inc.*, 330 F.3d 355, 359 (5th Cir. 2003). "To establish a [S]ection 1981 claim, the plaintiff must show that" (1) he is a racial minority; (2) "the defendant had an intent to discriminate on the basis of race;" and (3) the discrimination concerned an activity enumerated in Section 1981. *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997). Only the second element is at issue.

**IV.    ANALYSIS**

The analysis of discrimination and retaliation "claims under [Section] 1981 is identical to the analysis of" their Title VII equivalents. *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017); *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021). "Both discrimination and retaliation claims under [Section 1981] are subject to the *McDonnell Douglas* burden-shifting framework." *Jones*, 8 F.4th at 368; see *also Harrington v. Harris*, 118 F.3d 359, 367-68 (5th Cir. 1997) (applying the *McDonnell Douglas* framework to a Section 1981 claim). Under that standard, Strong must first prove a prima facie case. *Id.*; *Bellows*, 118 F.3d 268, 274. If he does so, UPT must articulate a "legitimate, nondiscriminatory" reason for

his termination. *Turner v. Kansas City Southern Ry. Co.*, 675 F.3d 887, 900 (5th Cir. 2012). Strong must then show "that [UPT's] proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (internal quotation marks and citation omitted).

> A. **The Court assumes that Strong has established a prima facie case of intentional discrimination, and UPT articulated a legitimate, nondiscriminatory reason for Strong's termination.**

To establish a prima facie case of driscrimination, Strong must show that he (1) is part of a protected group; "(2) was qualified for the position at issue;" (3) was discharged by the employer; and (4) "was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside of [his] protected group." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 339 (5th Cir. 2021) (citing *Stroy v. Gibson on behalf of Dep't of Veterans Affs.*, 896 F.3d 693, 698 (5th Cir. 2018)). The burden for establishing a prima facie case is "very minimal," so the Court assumes, without deciding, that Strong has established a prima facie case of intentional discrimination. *Sun v. TETRA Techs., Inc.*, No. 4:20-CV-04171, 2022 WL 10177681, at *3 (S.D. Tex. Oct. 17, 2022) (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)), *rec. adopted*, No. 4:20-CV-04171, 2022 WL 17170865 (S.D. Tex. Nov. 22, 2022), *aff'd*, No. 22-20646, 2023 WL 6892227 (5th Cir. Oct. 19, 2023).

"If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).

UPT's standing policy provides that "[p]reventable incidents that violate [the safety manual] policies are subject to disciplinary actions, up to and including termination." ECF No. 155 at 31. "Typically, by the time a driver has four preventable incidents within a two-year period,

9

he will be terminated." *Id*. at 208. UPT explains that it terminated Strong because on July 27, 2018, he had his fourth preventable incident in two years. ECF No. 153 at 9 (citing ECF No. 155 at *205, *29-33, *199). Namely:

> [(1) UPT] was notified by its customer that [Strong] had shorted the load dropped earlier that morning by nearly 800 gallons[; (2) Strong] had not notified dispatch that he retained fuel on his trailer, or even possibly had done so[; (3)] . . . UPT assigned the unit to another driver, who . . . began loading it with fuel for another delivery[; (4) t]he new load didn't fit[; and (5)] the other driver scullied as a result and got locked out of the loading rack for a week.

ECF Nos. 154 at 9 (internal citations omitted) (citing ECF No. 153 at 11, 18, 21-22, 26); 155 at 40-41, 55-58, 73-78, 204, 205). UPT maintains that it terminated Strong's employment because he did not report fuel retention. ECF No. 155 at 205. This is a legitimate, non-discriminatory reason for termination, and UPT has carried its burden.

### B. Strong has not shown that UPT's reason for termination was pretextual.

At this step of the analysis, Strong "must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of [UPT's] decision." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). He may establish pretext through evidence of disparate treatment or by showing UPT's explanation to be false or unworthy of credence. *Jones*, 8 F.4th at 368 (citing *Watkins v. Tregre*, 997 F.3d 275, 283 (5th Cir. 2021)). But he must produce "substantial evidence" of pretext. *Id*. at 369 (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)). "In deciding whether summary judgment is warranted, a court should consider, among other things, 'the probative value of the proof that the employer's explanation is false' and 'any . . . evidence that supports the employer's case.'" *Id.* (citing *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577-78 (5th Cir. 2020)).

UPT asserts that Strong has put forth no evidence that its explanation of his termination is pretextual. ECF No. 154 at 13. Strong contends that (1) there is a fact issue as to the amount of fuel he retained; and (2) he has shown evidence of UPT discriminating against its employees based on race. ECF No. 157-59. But because there is no fact issue as to whether Strong retained fuel and failed to report it, and the record lacks substantial evidence of pretext, Judge O'Connor should grant UPT's Motion.

1. <u>There is no dispute that Strong retained fuel in his tank and failed to report it and that this was a terminable offense because he had three previous incidents</u>.

Strong focuses much of his argument on the amount of fuel he retained. ECF No. 157 at 5. He argues that this in and of itself is a dispute of material fact, but he does not dispute that he retained some fuel. *Id.*; *see also* ECF No. 155 at 209 (at Strong's termination meeting, he only disputed "the *amount* of the retention" as opposed to "the fact of the retention" (emphasis in the original)). In his Response, Strong contends that he did not admit that he did not deliver 160 gallons to QT. ECF No. 158 at 2.

Strong's only evidence that his tank was empty is his testimony that he tapped the tank and checked the sight glass. Strong also relies on the "QuickTrip EPA Delivery Entry Report," which shows that on June 6, 2018, a driver named Jason Watson had a reported variance of 808 gallons. ECF No. 159 at 8, 13. It also shows Strong's variance on July 27, 2018, as 156 gallons. *Id.* at 9. He theorizes that James Watson does not exist and that UPT is covering up for an unnamed driver. *Id.* at 1, 16, 20. He also argues that because UPT paid the QT invoice two months after his termination, it is likely fraudulent or falsified. *Id.* at 2. But Strong's speculations do not overcome the overwhelming evidence that he had some fuel retention in his trailer. *Douglass*, 79 F.3d at 1429. It is undisputed that (1) Strong failed to perform the bucket test, which is the most accurate

11

way to evaluate fuel retention; (2) his iPad reported a 798-gallon retention; (3) the QT help desk reported an approximate 150-gallon variance; (4) QT billed UPT for a 798-gallon variance; and (5) the next person who drove his truck/trailer scullied out. Moreover, Strong's own evidence shows that there was some variance, which implies that he retained fuel in his trailer. ECF No. 159 at 9, 18. Thus, it remains undisputed that Strong left some fuel in his tank and did not report this retention.

Strong also argues that there is not proof to support his previous writeups. ECF No. 158 at 1-2. But the record shows that Strong had preventable incidents on October 5, 2016, December 21, 2017, and June 7, 2018, and that he was on his Final Written Warning at the time of the QT incident. *See* ECF No. 155 at 209, 33-37, 203. Strong admitted that if he had an 800-gallon retention, then UPT policy justified his termination. *Id.* at 265. He argues that "spill of such a large amount" would have shut the store down, resulted in emergency services being called, and made the local news (ECF Nos. 157 at 4; 158 at 1), but these are arguments, not evidence. The only evidence that Strong relies on is a letter that indicates that he never had an accident on June 21, 2016, as UPT contends. ECF No. 159 at 3-4. This falls outside of the two years before the July 27 incident, and UPT does not rely on it to form the basis of its termination decision. Thus, this letter is irrelevant to show pretext. Strong, therefore, has not shown a fact issue as to his relevant previous preventable incidents.

Finally, Strong contends that the subsequent driver was at fault for scullying out because he did not follow UPT's procedures to make sure there was no fuel left on the trailer. *Id.* at 3. But this has no bearing on the issue of whether Strong retained fuel and reported it. Strong has not shown any evidence that raises a fact issue on whether (1) he retained fuel; (2) he reported that retention; and (3) he had three preventable incidents leading up to the July 27 incident.

2. <u>There is no colorable evidence that racial animus motivated UPT</u>.

Strong also seeks to establish that racial animus motivated UPT in terminating him. He relies heavily on his own deposition and the deposition of Reese. Both testified that several Caucasian drivers made mistakes UPT did not discipline them. ECF No. 155 at 254-55, 176. However, Strong and Reece both admitted that they lacked personal knowledge of the events, the drivers' disciplinary histories, and whether the drivers were in fact disciplined. *Id.* at 255, 177 (Reese "never heard anything first-hand[; e]verything [was] rumors."). They also testified that UPT disciplined a few African Americans more harshly because of their race, but they again admitted that they had no personal knowledge of their disciplinary paperwork or histories. *Id.* at 254-57, 169.

Strong also testified that UPT gave a Caucasian driver, Chris Rich, special treatment. ECF No. 155 at 258. Rich received a dedicated eight runs in a day, while Strong only received four. *Id.* Viewing this evidence in the light most favorable to Strong, the evidence shows that UPT favored Rich, but it does not show that UPT did so because of Rich's race. Strong also relies on a text message from a UPT dispatch employee on November 11, 2017, who told Strong not to come to work that day because there was not any work that night and "the trailer was loaded with eth[a]nol for delivery later." ECF No. 159 at 23. Again, this text message in isolation does not show any preferential racial treatment on UPT's part, that UPT assigned the ethanol delivery to a Caucasian driver, or even that it was redirecting work away from Strong because of his race. Nothing in the record shows that UPT dispatched African American drivers on fewer runs than Caucasian drivers.

Strong also testified that he heard from someone that the shop manager, Shane Vaughn, told a mechanic to "n*****-rig the trucks." *Id.* at 260-61. But Strong admitted that Vaughn was not involved with Strong's termination. *Id.* at 261. Additionally, Reese and Strong at one time both

saw a confederate flag in the rear window of UPT employee, Scott Lee's vehicle. ECF No. 159. at 25-27, 30. But the record indicates that Mr. Lee also was not one of the decision makers regarding Strong's termination. ECF No. 155 at 280. Even if he had been, the flag in the window is not substantial evidence that UPT's reason for terminating Strong was pretextual. *Jones*, 8 F.4th at 369. Indeed, Strong and Reese admit that the primary decision maker behind Strong's disciplinary actions and termination, Bryain Bosch, never made any comments, jokes, or remarks regarding African Americans. ECF No. 155 at 5-6, 207, 244, 280. Strong presents no evidence of racial animus outside of his beliefs and Reese's "feeling." ECF No. 155 at 171 (Reese was unable to "put [her] finger on" why she thought Mr. Bosch was racist, other than a "feeling" and "vibe.").

Finally, for the first time in his Response, Strong alleges that UPT management subjected him to unidentified racial slurs. ECF no. 157 at 3; 158 at 2. The Court cannot consider this argument because "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108 (5th Cir. 2005). Strong has had ample opportunity to allege these facts before now in his original and two amended complaints, and he presents no evidence to support them in response to the Motion.

Viewing the summary judgment evidence in Strong's favor, he has not shown that UPT's proffered reason for terminating him was pretextual. The record contains no evidence that UPT did not terminate a similarly situated Caucasian driver (one who had four preventable incidents within two years). Nor does it contain any evidence of racial comments or derogatory jokes by any of the decisionmakers. Thus, Strong has not offered evidence to indicate that race played any role in his termination. Accordingly, Judge O'Connor should **GRANT** UPT's Motion as to Strong's claim for discrimination and **DISMISS** it.

### C. Strong has not shown a prima facie case of Section 1981 retaliation.

A prima facie case for a Section 1981 retaliation claim requires that a plaintiff show that: "(1) [he] engaged in a protected activity; (2) the employer took a materially adverse employment action against [him]; and (3) a causal link exists between the protected activity and the adverse employment action." *Wheat v. Fla. Par. Juv. Just. Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (internal citations omitted). On February 9, 2018, Strong filed a charge with the TWC and EEOC, complaining of race discrimination and retaliation. ECF No. 155 at 92-93. On August 1, 2018, UPT terminated him. *Id.* at 133, 209. Strong's filing was a protected activity, and his termination was an adverse employment action. *Ellis v. Compass Grp. USA, Inc.*, 426 F. App'x 292, 296 (5th Cir. 2011) (making a charge under Title VII is protected activity); *Wheat*, 811 F.3d at 710 (termination constitutes a materially adverse action). Thus, Strong must only prove the third element to present a prima facie case of retaliation.

UPT argues that there is no evidence of a causal connection to satisfy the third element. ECF No. 154 at 20. Strong did not respond to this argument. To show causation, the "the employee must provide substantial evidence that 'but for' exercising protected rights, [he] would not have been discharged." *Wheat*, 811 F.3d at 705. "[T]emporal proximity between a protected activity and alleged retaliation is sometimes enough to establish causation at the prima facie stage." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948 (5th Cir. 2015) "[T]he mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a *prima facie* case[.]" *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002) (emphasis in the original). Here, the only evidence of a causal connection between Strong's termination and his protected activity is the six-month gap between the two. This alone does not suffice to show a prima facie case of retaliation. *Id.* (causation not shown when the

only evidence presented was a five-month temporal proximity between the protected activity and the adverse event); *see also Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 428 n.23 (5th Cir. 2017) (noting that an eleven-month interval between protected activity and termination raised "serious temporal-proximity concerns"); *Barkley v. Singing River Elec. Power Ass'n*, 433 Fed. App'x 254, 260 (5th Cir. 2011) (holding a "four-month gap in time, standing alone, is insufficient to establish prima facie evidence of causation"). Because there is insufficient evidence to show a causal connection between Strong's TWC and EEOC filings and his termination, Judge O'Connor should **GRANT** UPT's Motion as to Strong's retaliation claim and **DISMISS** it.

## V.    CONCLUSION

UPT has articulated a legitimate, non-discriminatory reason for terminating Strong's employment, and Strong has not shown that it was pretextual. He also has not shown a prima facie case for retaliation. Therefore, no genuine issue exists as to any material fact, and UPT is entitled to judgment as a matter of law. Accordingly, the undersigned **RECCOMENDS** that Judge O'Connor **GRANT** UPT's Motion (ECF No. 153) and **DISMISS** Strong's claims.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). To be specific, an objection must identify the particular finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and

legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass*, 79 F.3d at 1417.

    **SIGNED** on April 4, 2024.

                                          Hal R. Ray, Jr.
                                          UNITED STATES MAGISTRATE JUDGE